COPY   FILED

2012 DEC 13  PM 2:01

CLERK, U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY _____

1  ERIC R. HAVIAN (SBN 102295)
   erh@pcsf.com
2  STEPHEN HASEGAWA (SBN 198472)
   ssh@pcsf.com
3  EDWARD H. ARENS (SBN 259155)
   eha@pcsf.com
4  PHILLIPS & COHEN LLP
   100 The Embarcadero, Suite 300
5  San Francisco, California 94105
   Tel: (415) 836-9000
6  Fax: (415) 836-9001

7  Attorneys for Intervenors,
   BALDWIN PARK UNIFIED SCHOOL DISTRICT,
8  MONROVIA UNIFIED SCHOOL DISTRICT,
   ROWLAND UNIFIED SCHOOL DISTRICT and
9  STOCKTON UNIFIED SCHOOL DISTRICT

10  (APPEARANCES CONTINUED ON NEXT PAGE.)

11
12              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
13
14  STATE OF CALIFORNIA, et al., ex        Case No. 2:12-cv-09952-R-CW
    rel. DAVID SHERWIN,                    Hon. Manuel L. Real
15
                    Plaintiffs,            **COMPLAINT-IN-INTERVENTION
16                                         OF BALDWIN PARK UNIFIED
            v.                             SCHOOL DISTRICT, MONROVIA
17                                         UNIFIED SCHOOL DISTRICT,
    OFFICE DEPOT, INC.,                    ROWLAND UNIFIED SCHOOL
    a Delaware corporation,                DISTRICT, AND STOCKTON
18                                         UNIFIED SCHOOL DISTRICT**
                    Defendant.
19                                         (1)   Violation of False Claims Act,
20                                               Cal. Gov't Code §§ 12650 et
                                                 seq.
21                                         (2)   Breach of Contract
                                           (3)   Fraud
22
                                           **JURY TRIAL DEMANDED**
23
                                           Date: N/A (no hearing required)
24

25

26

27

28

1   DANA J. MCCUNE (SBN 82525)
    dmccune@mccuneharber.com
2   MCCUNE & HARBER LLP
    515 South Figueroa Street, Suite 1150
3   Los Angeles, CA 90071
    Tel: (213) 689-2500
4   Fax: (213) 689-2501

5   Attorneys for Intervenors,
    BALDWIN PARK UNIFIED SCHOOL DISTRICT,
6   MONROVIA UNIFIED SCHOOL DISTRICT, and
    ROWLAND UNIFIED SCHOOL DISTRICT
7
    CHESLEY D. QUAIDE (SBN 136238)
8   cquaide@aalrr.com
    ATKINSON, ANDELSON, LOYA, RUUD & ROMO, P.C.
9   5075 Hopyard Road, Suite 210
    Pleasanton, California 94588
10  Tel: (925) 227-9200
    Fax: (925) 227-9202
11
    Attorneys for Intervenor STOCKTON UNIFIED SCHOOL DISTRICT
12
    MARK ALLEN KLEIMAN (SBN 115919)
13  mkleiman@quitam.org
    2907 Stanford Avenue
14  Venice, California 90292
    Tel: (310) 306-8094
15  Fax: (310) 306-8491

16  Attorneys for Intervenors,
    BALDWIN PARK UNIFIED SCHOOL DISTRICT,
17  MONROVIA UNIFIED SCHOOL DISTRICT,
    ROWLAND UNIFIED SCHOOL DISTRICT and
18  STOCKTON UNIFIED SCHOOL DISTRICT

19  ALTOMEASE R. KENNEDY (*Pro Hac Vice*)
    akennedy@mcknightandkennedy.com
20  MCKNIGHT & KENNEDY LLC
    8601 Georgia Avenue, Suite 1010
21  Silver Spring, Maryland 20901
    Tel: (301) 565-5281
22  Fax: (301) 565-5285

23  Attorneys for Intervenors,
    BALDWIN PARK UNIFIED SCHOOL DISTRICT,
24  MONROVIA UNIFIED SCHOOL DISTRICT,
    ROWLAND UNIFIED SCHOOL DISTRICT and
25  STOCKTON UNIFIED SCHOOL DISTRICT

26

27

28

1     Pursuant to section 12652(c)(8)(E) of the California Government Code,

2   Plaintiffs Baldwin Park Unified School District ("BPUSD"), Monrovia Unified

3   School District ("MUSD"), Rowland Unified School District ("RUSD"), and

4   Stockton Unified School District ("SUSD") (collectively, "Plaintiffs") hereby

5   intervene in this action and allege as follows:

6     1.     Plaintiffs incorporate by reference the Corrected First Amended

7   Complaint of *Qui Tam* Plaintiff David Sherwin, filed on January 20, 2012 (the "*Qui*

8   *Tam* FAC").

9     2.     This is an action to recover damages and civil penalties arising from

10   false claims made by defendant Office Depot, Inc. ("Office Depot" or "Defendant")

11   in violation of the California False Claims Act ("CFCA"), Cal. Gov't Code § 12650

12   *et seq.*

13   **I.     INTRODUCTION**

14     3.     The U.S. Communities Government Purchasing Alliance ("U.S.

15   Communities") is a nonprofit organization that maintains a variety of procurement

16   contracts for the purchase of goods and services by state and local public entities.

17   U.S. Communities selects "lead" public entities to negotiate and manage the

18   contracts with various suppliers.  By agreement with the lead entity and the supplier,

19   it then extends the terms of the contract to each of its members, by virtue of an

20   "administrative agreement" between itself and the supplier.  State and local public

21   entities nationwide participate in U.S. Communities because it lightens their

22   contracting burden, and because they believe U.S. Communities' contracts provide

23   them with the best prices and terms available.

24     4.     U.S. Communities' largest contract is a supply contract for office and

25   stationery supplies and products (the "USC contract").  From 1996 to 2010, the USC

26   contract was negotiated and managed between the County of Los Angeles ("L.A.

27   County"), which acted as the lead public entity, and Office Depot.  Public entities

28   nationwide may adopt or subscribe to the USC contract by virtue of an

- 3 -

{00043590; 2}

administrative agreement between U.S. Communities and Office Depot.  Over the life of the USC contract, hundreds or thousands of state and local public entities, including Plaintiffs, bought their office supplies from Office Depot pursuant to the USC contract's terms.  The USC contract was Office Depot's largest individual contract.

5.     The USC contract included a guarantee that all public entities participating in the USC contract, including Plaintiffs, would receive Office Depot's "most favored public entity" pricing.

6.     Since being awarded the USC contract, however, Office Depot has negotiated separate contracts with public entities outside U.S. Communities at prices lower than those in the USC contract.  Office Depot was required to incorporate those favorable prices into the USC contract immediately.  Office Depot failed to incorporate the lower prices, however, because it wanted to win new business with competitive pricing without giving up the extra revenue it was receiving from the USC contract's higher prices.

7.     Office Depot also overcharged Plaintiffs by overstating its costs for certain items, which allowed it to charge Plaintiffs its minimum "floor" price for those items, when it fact it should have charged Plaintiffs its normal fixed discount price.  To overstate the cost of an item, Office Depot both padded its invoiced cost from the manufacturer with other costs and failed to factor in any manufacturer rebates it had received for the item.

8.     Next, Office Depot increased its list prices in violation of the USC contract.  The USC contract restricts Office Depot to raising its prices only twice a year.  Moreover, it sets many prices based on the manufacturer's (not Office Depot's) "list" price.  Office Depot, however, knowingly increased its prices more than twice a year by manipulating the list price of its private label brand products for which it was the manufacturer and thus controlled the list price.  Office Depot's prices for various private-label brand items sometimes increased daily on its website

{00043590; 2}

1  for USC contract customers.  Moreover, Office Depot worked to replace items sold

2  under third party brands, whose list prices it could not manipulate, with its private-

3  label brand items, whose list prices it could increase at will.

4      9.     Finally, Office Depot improperly discontinued items on the USC

5  contract's heavily discounted "core" list, knowing that Plaintiffs would then order

6  the same items at the contract's more expensive discounted wholesale price.

7      10.    Through each of these fraudulent schemes, described in detail below,

8  Office Depot has overcharged Plaintiffs significantly.

9  **II.    PROCEDURAL BACKGROUND**

10     11.    On March 20, 2009, *Qui Tam* Plaintiff David Sherwin ("Relator") filed

11 a Complaint pursuant to the California False Claims Act, Cal. Gov't Code

12 §§ 12650-12655, seeking to recover damages and civil penalties arising from

13 Defendant's actions in presenting, or causing to be presented, false claims, and

14 Defendant's actions in presenting, or causing to be presented, false records and

15 statements to Plaintiffs and other governmental entities (the "*Qui Tam* Action").

16 Relator filed the *Qui Tam* FAC on January 20, 2012.

17     12.    BPUSD and MUSD intervened in the *Qui Tam* Action by notice filed

18 August 14, 2012.  *See* Cal. Gov't Code § 12652(c)(8)(E).  SUSD intervened in the

19 *Qui Tam* Action by notice filed September 28, 2012.  *Id.*  RUSD intervened in the

20 *Qui Tam* Action by notice filed October 19, 2012.  Plaintiffs incorporate the *Qui*

21 *Tam* FAC and all of its allegations by reference herein.  As to allegations in the *Qui*

22 *Tam* FAC based on non-documentary evidence, Plaintiffs incorporate those

23 allegations herein upon information and belief.

24 **III.   PARTIES**

25     13.    BPUSD is a political subdivision of the State of California, governed

26 by the statutes of the State of California, with the power to sue and be sued.

27 BPUSD purchased supplies from Office Depot under the USC contract.

28

{00043590; 2}

14.　　MUSD is a political subdivision of the State of California, governed by the statutes of the State of California, with the power to sue and be sued.  MUSD purchased supplies from Office Depot under the USC contract.

15.　　RUSD is a political subdivision of the State of California, governed by the statutes of the State of California, with the power to sue and be sued.  RUSD purchased supplies from Office Depot under the USC contract.

16.　　SUSD is a political subdivision of the State of California, governed by the statutes of the State of California, with the power to sue and be sued.  SUSD purchased supplies from Office Depot under the USC contract.

17.　　The Relator is David Sherwin, a resident and citizen of Florida. Plaintiffs are informed and believe, and therefore allege, that Relator was employed by Office Depot as an Account Manager III in its Business Solutions Division ("BSD") from 1996 to April 11, 2008.  Plaintiffs are informed and believe, and therefore allege, that as an Office Depot Account Manager III, Relator personally handled the accounts for numerous school boards and city and county agencies.

18.　　Defendant Office Depot is a Delaware corporation with headquarters at 6600 North Military Trail, Boca Raton, Florida 33496.  Office Depot is a national supplier of office products and services.  It has two business segments in North America: the Retail Division and BSD.  BSD sells both nationally-branded and private-label office supplies, including general supplies (*e.g.*, pens and pencils), paper, technology products, and office furniture.  It sells these products directly to customers through catalogs and the Internet, as well as by entering into supply contracts with large and medium-sized customers.  BSD's contract customers include state and local public entities.  From 1995 to 2011, BSD conducted business with many of these public entities, including Plaintiffs, pursuant to the USC contract, which was its single largest contract.

{00043590; 2}

**IV.   JURISDICTION AND VENUE**

19.   This Court has jurisdiction over the *Qui Tam* Action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

20.   The Court has personal jurisdiction over Defendant because Defendant conducts business in the State of California and sells office products to various California agencies and political subdivisions.

21.   Venue is proper in accordance with 28 U.S.C. § 1441(a) because this district and division embrace the place in which the *Qui Tam* Action was pending prior to removal under 28 U.S.C. § 1453.

**V.   PLAINTIFFS' SUPPLY CONTRACTS WITH OFFICE DEPOT**

22.   U.S. Communities is a nonprofit instrumentality of government designed to assist government agencies and educational institutions in making purchases of products and services.  It is headquartered in Walnut Creek, California. Its Advisory Board is made up of purchasing officials from various local government agencies across the United States.  The founding co-sponsors of U.S. Communities are the National Association of Counties, National League of Cities, Association of School Business Officials International, the United States Conference of Mayors and the National Institute of Governmental Purchasing.

23.   All U.S. Communities contracts are competitively solicited by a lead public entity.  The lead public entity negotiates the terms of the contract on behalf of all other U.S. Communities members, pursuant to state joint powers agreements. *See, e.g.*, Cal. Gov't Code §§ 6500, 6502 ("[Two or more public agencies by agreement may jointly exercise any power common to the contracting parties."). These members include more than 31,000 public entities throughout the United States, who use various U.S. Communities contracts and suppliers to procure over a billion dollars annually in goods and services.

24.   One of the contracts that U.S. Communities offers to its members is the USC contract.  U.S. Communities members order approximately $700 million worth

of materials each year under the USC contract, making it easily the largest individual office supplies contract in the country.

25.     At all relevant times, L.A. County served as the lead public entity that solicited and executed the USC contract with Office Depot on behalf of U.S. Communities.  L.A. County awarded the initial USC contract to Office Depot in 1995.  L.A. County again awarded the USC contract to Office Depot in 2001 pursuant to Master Agreement No. 41421, which expired on January 1, 2006.  In 2005, L.A. County awarded Office Depot the USC Contract pursuant to Master Agreement No. 42595, effective January 2006.  Master Agreement No. 42595 expired on January 1, 2011 and was not renewed.

**A.     U.S. Communities Master Agreement No. 41421**

26.     On March 5, 2001, L.A. County entered into Master Agreement No. 41421 for Office and Stationery Supplies and Products (the "2001 Contract") with Office Depot, on behalf of U.S. Communities.  *See* Exhibit 1 to the *Qui Tam* FAC, incorporated herein.  The term of the 2001 Contract was three years, with an expiration date of March 4, 2004 and a provision granting L.A. County the right to extend the contract in one-year increments.  *Id.* at ¶¶3.1.1, 5.2.  L.A. County exercised those rights, extending the 2001 Contract through January 1, 2006.

27.     The 2001 Contract contained a "Participating Municipalities" clause that gave L.A. County the right to "inform other [California governmental] entities that they may acquire items listed in this Agreement … [and that] [s]uch acquisition(s) shall be at the prices stated herein, and shall be subject to [Office Depot's] acceptance."  Exhibit 1 to the *Qui Tam* FAC, at ¶36.0.

28.     The basic pricing structure of the 2001 Contract was for Office Depot to provide U.S. Communities participants with fixed prices for specific items identified as "core" products and specified discounts off of published list prices for all other items (i.e., "non-core" items).  *See* Exhibit 1 to the *Qui Tam* FAC, at ¶6.2.1 ("Vendor agrees for the period of this Agreement that prices for products covered

{00043590; 2}

1  herein [w]ill be based on a Minimum Trade Discount from current published price

2  list, [e]xcept for those identified … as Core Products.").

3         29.     The 2001 Contract's Base Agreement, covering all pricing schedules,

4  provided that "Price changes will be allowed only on a semi-annual basis on January

5  1st and July 1st of each contracting year."  *Id.* at ¶6.2.1.  Moreover, it stated that

6  Office Depot "shall advise" L.A. County "in writing of any [p]roposed price

7  increases or manufacturer's discount structure changes."  *Id.* at ¶6.2.2.

8         30.     The 2001 contract provided for fixed prices for specific items listed as

9  "core" products, and for fixed percentage discounts off Office Depot's catalog

10 prices, with a 15% gross profit ("GP") floor, for all "non-core" products:

11         All in-stock items shown in the Office Depot Business Services Division

12         Office Products (BSD) and Frequently Ordered Products (MFOI) Catalog

13         shall be priced at the following discounts from the Manufacturer's list price or

14         at the net prices referenced in Attachments A (Core Products).  Items priced

15         at a discount from manufacturer's list price include a 15% minimum gross

16         profit percentage floor.

17 *Id.* at Ex. B.  The discount was 45% off Business Services Division Office Products

18 ("BSD") or 63% off Frequently Ordered Products ("MFOI") catalog, subject in both

19 cases to a 15% GP floor.  *Id.*  The contract also separated non-core items into

20 several categories: general office and stationery supplies; electronic equipment;

21 school supplies; computer equipment and supplies; and furniture.  *Id.*  The core

22 products and their negotiated prices were listed in attachments to the pricing

23 schedule.  *Id.*

24        31.     The 2001 Contract contained volume discounts (up to 1.5% of total

25 sales volume) and electronic order transaction discounts (up to 1% of total sales

26 volume).  *Id.* at Ex. E.

27

28

COMPLAINT-IN-INTERVENTION OF BPUSD,
MUSD, RUSD, AND SUSD

32.     Office Depot agreed to extend its lowest prices for public entities to Plaintiffs.  The 2001 Contract contained a "Most Favored Public Entity" clause, which in full provided:

> VENDOR represents that the price charged to COUNTY in this Agreement do [sic] not exceed existing selling prices to other customers for the same or substantially similar items or services for comparable quantities under similar terms and conditions.  If VENDOR'S prices decline, or should VENDOR, at any time during the term of this Master Agreement, provide the same goods or services under similar quantity and delivery conditions to the State of California or any county, municipality or district of the State at prices below those set forth in this Master Agreement, then such lower prices shall be immediately extended to COUNTY.

Exhibit 1 to the *Qui Tam* FAC, at ¶23.0.

33.     During negotiations, Office Depot proposed an exception to the Most Favored Public Entity clause that would have limited the clause to Office Depot's lowest terms for comparably-sized customers *excluding* governmental agencies.  *See id.* at Ex. E.  L.A. County rejected this exception, and it did not become part of the 2001 Contract.  *Id.*

**B.     U.S. Communities Master Agreement No. 42595**

34.     On November 8, 2005, L.A. County issued Master Agreement No. 42595 for Office and Stationery Supplies and Products to Office Depot on behalf of U.S. Communities, and the contract became effective on January 2, 2006 ("2006 Contract").  *See* Exhibit 2 to the *Qui Tam* FAC, incorporated herein.  The 2006 Contract expired on January 1, 2010 with a provision for two one-year extensions.  *See id.* at ¶5.2.1.  L.A. County exercised the first extension (through January 1, 2011) but declined to exercise the second extension, instead re-bidding the contract in 2010.  L.A. County did not award the new contract to Office Depot.

- 10 -

35.     The 2006 Contract designates U.S. Communities as "the agency to provide administrative services related to purchases by other governmental entities … under this Agreement." *Id.* at ¶36.0.

36.     Office Depot agreed to offer Plaintiffs its lowest prices offered to governmental entities within California.  The cover page to the 2006 Contract contained a best price guarantee, which provides in full:

> PRICE GUARANTEE: Unless otherwise provided herein, prices are maximum for the period of this agreement.  In the event of a price decline, or, should you at any time during the life of this agreement sell the same material or service under similar quantity and deliver conditions to the State of California, or legal district thereof, or to any county or Municipality within the State of California at prices below those stated herein, you will immediately extend such lower prices to Los Angeles County.

Exhibit 2 to the *Qui Tam* FAC.

37.     In addition, the 2006 Contract contained the same "Most Favored Public Entity" clause found in the 2001 Contract.  *Id.* at ¶23.0.

38.     In addition to these provisions, Office Depot signed nationwide "Supplier Commitments" as part of its bid to L.A. County and of its administrative agreement with U.S. Communities.  The Supplier Commitments were signed by BSD Vice President for Government and Education Robert Cetina, the same Office Depot executive who signed Master Agreements No. 41421 and 42595.  As a condition of its continued partnership with U.S. Communities, Office Depot signed a "Pricing Commitment" promising that:

> [Office Depot's] U.S. Communities pricing is the lowest available pricing (net to buyer) to state and local public agencies nationwide and a further commitment that, if a state or local public agency is otherwise eligible for lower pricing through a federal, state, regional or local contract, the supplier will match the pricing under U.S. Communities.

{00043590; 2}

Exhibit 3 to the *Qui Tam* FAC, incorporated herein, at 2.  In affirming the Supplier Commitments, Office Depot acknowledged that they are "the foundation of the relationship between U.S. Communities and its suppliers." *Id.*  Additionally, Office Depot agreed to U.S. Communities' "Public Agency Solicitation Response Guidelines," confirming that it would respond to any bid or request for proposal from a public agency (outside the USC contract) by offering pricing that was either higher or the same as its USC contract pricing.  Office Depot affirmed that "[i]f competitive conditions require[] pricing lower than the standard U.S. Communities contract pricing, the supplier can submit lower pricing *through the U.S. Communities contract.*  If successful the sales would be reported under U.S. Communities."  Exhibit 3 to the *Qui Tam* FAC, at 5 (emphasis added).  These Supplier Commitments, which were part of L.A. County's contract solicitation, were incorporated by reference in the 2006 Contract.  Exhibit 2 to the *Qui Tam* FAC, at 12-13, ¶ 1.1.

39.     The 2006 Contract also incorporated by reference L.A. County's Request for Proposal ("RFP").  Exhibit 2 to the *Qui Tam* FAC, at 12-13, ¶ 1.1.  L.A. County's RFP included the Supplier Commitments described above and three additional relevant provisions.  Paragraph 22 of the RFP's Terms and Conditions of Purchase read:

> MOST FAVORED CUSTOMER:  Vendor represents that the prices charged County in this Purchase Order do not exceed existing selling prices to other customers for the same or substantially similar items or services for comparable quantities under similar terms and conditions.

Paragraph 16 of the RFP's bidders' instructions read, in relevant part:

> If prices decline, or should vendor at any time during the life of said agreement sell the same materials or service under similar quantity and delivery conditions to the State of California, or any county, municipality or legal district of the State of California at prices below those quoted herein,

- 12 -

1  such lower prices shall be immediately extended to the County of Los

2  Angeles.

3  (All-caps formatting omitted.)  Finally, Attachment E to the RFP repeated the

4  Supplier Commitments described above and, at Paragraph 2.0, stated that a

5  supplier's "commitment to guarantee lowest government pricing" was a "minimum

6  qualification" for bidders.

7  40.  The 2006 Contract contained five pricing schedules.  The first two

8  schedules appeared at Exhibits A and A-1 to the agreement, and were known within

9  Office Depot as "Option 1."  In general, under Option 1, items identified as "core

10  products" received fixed pricing, while most items identified as "non-core products"

11  were priced at a 45% discount from Office Depot's supplier catalog with a 15%

12  gross profit ("GP") floor, at a 10% discount from Office Depot's wholesale catalog,

13  or at a 70% discount off Office Depot's MFOI catalog with a 15% GP floor.

14  Certain "non-core products," such as technology and paper products, were priced at

15  Office Depot's cost plus a gross margin ("GM") percentage.

16  41.  With the exception of a larger discount on MFOI catalog items, Option

17  1 was essentially the same as the pricing schedule in the 2001 Contract.

18  42.  The third and fourth schedules appeared as Exhibits A-3 and A-4 to the

19  agreement, and are known within Office Depot as "Option 2."  Under Option 2's

20  "alternative pricing option," new to the 2006 Contract, core products received fixed

21  pricing while non-core products were priced at 10% less than the price listed on

22  Office Depot's website (this model was known as "Web price less" or "WL").

23  43.  The 2006 Contract's Base Agreement, covering both Option 1 and

24  Option 2, provided that "Price changes (increases) from price lists will be allowed

25  only on a semi-annual basis on January 1st and July 1st of each contracting year."

26  Exhibit 2 to the *Qui Tam* FAC, at ¶6.2.1.  Moreover, it stated that Office Depot

27  "shall advise [L.A. County] in writing of any proposed price increases or

28  manufacturer's discount structure changes."  *Id.* at ¶6.2.2.

{00043590; 2}

44.     In March 2006, the 2006 Contract was amended to include a rebate structure giving customers up to a 5% volume rebate. *Id.* at 41 (Amendment 01).  In May 2006, the rebate structure was amended to offer high-volume customers a choice between the rebate and an increased discount on some or all items. *Id.* at 40 (Amendment 02).

45.     In March 2009, the 2006 Contract was amended to replace the five pricing schedules, including Options 1 and 2, with a single pricing schedule.  Under the new pricing schedule, all products listed in Office Depot's supplier catalog received fixed pricing, with core products identified as "best value" items.  Products not listed in Office Depot's supplier catalog were priced at a 10% discount off the list price shown on Office Depot's website on the date of purchase.  The prices in Office Depot's supplier catalog were fixed for a set period depending on the product.  Core products were subject to annual price changes on January 1 of each year, with Office Depot required to provide 60 days' written notice of any changes.  Most non-core products were subject to price changes semi-annually on January 1 and July 1 of each year, with the same written notice requirement.  (Paper, ink, and toner were subject to more frequent price changes, with 30 days' written notice required.)

### C.     Plaintiffs Purchased Supplies from Office Depot Under the USC Contract

46.     Plaintiffs were participants in the USC contract.  Office Depot knew that Plaintiffs were such participants and sold office and stationery supplies to Plaintiffs pursuant to the USC contract's provisions.

## VI.   SUPPLEMENTAL FACTUAL ALLEGATIONS

47.     Office Depot knowingly violated its contracts with Plaintiffs through a variety of underhanded pricing practices, including, without limitation, the following:

- 14 -

- First, Office Depot entered into office supply contracts with public entities outside the USC contract at prices lower than those in the USC contract, and intentionally did not extend those lower prices to Plaintiffs as was required under its contract, which incorporated the USC contract's "Most Favored Public Entity" provision and Office Depot's "Pricing Commitment" to U.S. Communities.

- Second, Office Depot routinely charged Plaintiffs the supposed minimum price set by the 15% GP floor, rather than the 45% or higher discount from list pricing, by misrepresenting that its cost for the item, and hence the GP floor, was higher than it actually had been.  Thus, Plaintiffs regularly paid Office Depot at a fraudulently inflated "minimum" price rather than at the appropriate discounted price.

- Third, Office Depot intentionally did not apply manufacturer rebates either to its list price or to its cost when calculating the GP floor, thereby causing Plaintiffs to pay a higher price under both the discounted price and the alternative minimum (GP floor) price.

- Fourth, Office Depot increased its prices at any time, and on more than two occasions annually (sometimes daily), in knowing violation of the USC contract, which limited price changes to two dates each year, January 1 and July 1.

- Fifth, Office Depot overcharged Plaintiffs by improperly discontinuing core list items so that future orders for those items, which were previously priced at heavily discounted core list prices, would now be priced at only a 10% discount off the wholesale catalog list price.

**A.** **Office Depot Knowingly Overcharged Plaintiffs By Not Offering Them Its Guaranteed "Most Favored Public Entity" Prices**

48.    Office Depot defrauded Plaintiffs by charging Plaintiffs higher prices than the prices it offered to other governmental entities in California, despite

promising in the USC contract, as well as the signed "Pricing Commitment" to U.S. Communities incorporated in the contract, that it would provide Plaintiffs with its "Most Favored Public Entity" pricing.  Office Depot knew it was offering other government customers significantly better prices than it was offering Plaintiffs, but chose not to report those better prices to L.A. County or otherwise extend them to the USC contract, both in knowing violation of its contract.  As a result, Plaintiffs overpaid Office Depot significantly for office supplies.

49.     As described above, since at least 2001 the USC contract contained several clauses guaranteeing L.A. County, and by extension Plaintiffs, Office Depot's best pricing available to any public entity in California (the "MFPE provision").  *See* ¶¶32, 36–39 above.

50.     Notwithstanding these promises, Office Depot entered into at least two contracts with California public entities that offered pricing more favorable to that in the USC contract.  At the time it entered into the contracts, Office Depot knew it was obligated to extend the new contracts' lower prices to the USC contract.  In both cases, however, Office Depot knowingly failed to incorporate the lower prices into the USC contract.

### 1.     Office Depot's Contract with the City and County of San Francisco

51.     In August 2004, the City and County of San Francisco, California ("San Francisco") issued Contract Proposal No. 96703 for office supplies and related services.  The term of the proposed contract was November 1, 2004 to April 30, 2007.  The contract proposal included a bid sheet consisting of two sections. Section A covered specific core items (called "contract items" in the San Francisco contract, but referred to herein as "core items" for ease of comparison to other contracts) whose historical usage represented 55% of the San Francisco's total.  The bid sheet called out each item by manufacturer number and sought the bidder's fixed price for that item (or an alternative) for the contract term.  Section B covered non-

{00043590; 2}

core items (called "non-contract" items in the San Francisco contract, but referred to as "non-core items" herein), which the bid sheet defined as "all items not represented in Section A [*i.e.*, not represented on the core item list] or 45% of total spend." Section B called for non-core items to be priced at discount percentages. It stated that:

> A Gross Margin "floor," as defined as a minimum gross margin on the item after discount applied, will only be accepted as a minimum gross margin on the item after application of discount off list. Any vendor either imposing a "floor" above cost after submittal will automatically disqualify the vendor from an award or accordingly be subject to immediate termination of the contract.

52.     The Section B bid sheet identified sixteen categories with a total list price of $4,181,135 based on San Francisco's 2003 off-contract purchases. The bid sheet sought the bidder's discount percentage off the stated manufacturer's list price for each category.

53.     Office Depot submitted a bid to San Francisco, including completed Section A and B bid sheets. *See* Exhibit 4 to the *Qui Tam* FAC, incorporated herein (Office Depot's bid and San Francisco's contract acceptance); Exhibit 5 to the *Qui Tam* FAC, incorporated herein (Section A and B bid sheets). San Francisco accepted Office Depot's bid on January 5, 2005. *See* Exhibit 4 to the *Qui Tam* FAC.

54.     Under its contract with San Francisco, Office Depot agreed to fixed prices for the items on San Francisco's contract list (Section A). *See* Exhibit 5 to the *Qui Tam* FAC. For most non-core items (Section B), Office Depot offered discounts of 70-72% of the manufacturer's list price. *See id.* For non-core art supplies and office furniture, these discounts were 45-50% of the manufacturer's list price. *See id.*

55.     Office Depot's contract with San Francisco did not employ gross profit or gross margin floors. On November 23, 2004, while San Francisco was evaluating

Office Depot's bid, Office Depot Regional Sales Director Patrick Welch clarified to San Francisco's Assistant Director of Purchasing that "Relative to your questions concerning the use of gross margin floors in our price offering, I reiterate that Office Depot has not utilized gross margin floors in our price offering."

### 2.    Office Depot's Contract with the City of Berkeley

56.    In approximately June 2006, Office Depot responded to a request for proposal from the City of Berkeley, California ("Berkeley") with a bid for the procurement of office supplies.  *See* Exhibit 6 to the *Qui Tam* FAC, incorporated herein.  Similar to the USC and San Francisco contracts, Office Depot's bid priced core and non-core items differently.   Core items received fixed pricing.   Non-core items, meanwhile, were to receive "an overall 55% mixed discount structure from our current BSD catalog's Manufacturer's Suggested List Price."  *See id.*  In a signed letter from Office Depot Account Manager Earl Ante to Berkeley's Finance/Purchasing Department, Office Depot specified that its mixed discount structure calculated the discounts "on the average blended discount of manufacturers list price," whereby "[s]ome items within the [non-core] categories may reflect a higher than 55% discount while other items may be less."  *Id.*  Office Depot provided Berkeley with the particular line-item discounts it would provide for non-core items.

57.    The non-core item categories subject to average blended discount pricing were: art & drafting; binders; calendars & organizers; desk supplies & office essentials; filing needs; forms, recordkeeping & references; mailing, packing & labeling; supplies; office furniture; paper, pads & rolls; PCF [processed chlorine-free] paper; pens, pencils & correction; janitorial, breakroom facility; specials; and toner, ink & ribbons.

58.    Office Depot also offered Berkeley a 1% rebate on orders placed through its website.

{00043590; 2}

59.    Berkeley accepted Office Depot's bid in approximately July 2006, with the contract to run from 2007 to 2009.

### 3.    Office Depot's Contracts with San Francisco and Berkeley Gave Them Lower Prices than Plaintiffs

60.    Office Depot offered San Francisco and Berkeley substantially lower prices than it offered to Plaintiffs.  Under its contract with Plaintiffs and its commitments to U.S. Communities, Office Depot was required to immediately extend those favorable prices to Plaintiffs.  Office Depot knowingly failed to do so.  Consequently, Office Depot defrauded Plaintiffs by the difference between the lower prices it charged to San Francisco or Berkeley and the higher prices it charged to Plaintiffs for the same or equivalent items.

61.    As described above, the USC contract generally calls for a 45% discount, with a 15% GP floor, for non-core items.  San Francisco, meanwhile, received non-core item discounts of 45% *minimum*, with most products discounted at 70-72%, and no GP floor.  Berkeley, furthermore, received discounts on non-core items at an average blended rate of 55%, also with no GP floor.  Most non-core items purchased under the USC contract would have received lower prices under the San Francisco and Berkeley contracts, either because of the more favorable discount structures for non-core items under those contracts or, in some cases, because those items were entitled to low core-item pricing under the San Francisco and Berkeley core item lists.

62.    Plaintiffs' purchasing records, which reflect Office Depot's actual claims for payment from Plaintiffs for their purchases under the USC contract, confirm that, by failing to extend the pricing under the San Francisco and Berkeley contracts to Office Depot's U.S. Communities customers, Office Depot overcharged Plaintiffs.  These records document thousands of purchase transactions made by Plaintiffs under their contracts with Office Depot.  Below are representative examples showing how Office Depot overcharged Plaintiffs relative to San

{00043590; 2}

Francisco and Berkeley.  Each transaction set forth below identifies an actual transaction between Office Depot and a Plaintiff under the USC contract (and describes Plaintiffs' actual payments under each transaction, pursuant to actual claims for payment that Office Depot submitted to Plaintiffs), the prices for the same item at the same time under the San Francisco and Berkeley contracts, and the percentage by which the price actually charged to the relevant Plaintiff exceeded the price for the item under the San Francisco and Berkeley contracts.

### a)  Toner Items

63.    The USC, San Francisco, and Berkeley contracts all included toner products among their non-core items.  "Option 1" of the USC contract priced "toner items" at 45% off the manufacturer's list price with a 15% GP floor or at 10% off Office Depot's wholesale catalog.  Office Depot's contract with San Francisco priced "toner, ink & ribbons" at 71% off the manufacturer's list price.  Office Depot's contract with Berkeley priced "toner, ink & ribbons" at the 55% average blended discount.  Office Depot's sales records for Plaintiffs show the price differences from these discounts:

**BPUSD**

| Date | Product Description | Quantity Sold | List Price | Baldwin Park USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| May-06 | TONER,4500 SERIES,BLACK | 1 | $119.78 | $77.10 | $34.74 | 55% | $53.90 | 30% |
| May-06 | INK CARTRIDGE,96,BLACK,HP | 4 | $36.05 | $27.14 | $10.45 | 61% | $16.22 | 40% |
| Jun-06 | CARTRIDGE,HP,I.J,4250/4350 | 2 | $207.76 | $133.74 | $60.25 | 55% | $93.49 | 30% |
| Jun-06 | TONER,Q2670A,HP,F/CLJ3500 | 1 | $184.00 | $118.73 | $53.36 | 55% | $53.43 | 55% |

**MUSD**

| Date | Product Description | Quantity Sold | List Price | Montrovia USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| Jun-09 | TONER,HP P1005,P1006,BLAC | 6 | $199.00 | $179.10 | $57.71 | 68% | $89.55 | 50% |
| Oct-09 | TONER,REMAN,OD,4250/4350 | 2 | $186.99 | $99.00 | $54.23 | 45% | $84.15 | 15% |
| Jun-09 | TONER,HP P1005,P1006,BLAC | 6 | $199.00 | $179.10 | $57.71 | 68% | $89.55 | 50% |

COMPLAINT-IN-INTERVENTION OF BPUSD,
MUSD, RUSD, AND SUSD

{00043590; 2}

| Oct-09 | CARTRIDGE,TONER,REMAN,OD1 | 2 | $96.29 | $46.24 | $27.92 | 40% | $20.81 | 55% |

**SUSD**

| Date | Product Description | Quantity Sold | List Price | Stockton USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|------|---------------------|---------------|------------|-------------------------|-------------------------------------|-------------------------------|-------------------------------------|---------------------------|
| Mar-06 | TONER,4500 SERIES,BLACK | 1 | $119.78 | $62.42 | $34.74 | 44% | $53.90 | 14% |
| May-06 | INK CARTRIDGE,96,BLACK,HP | 6 | $36.05 | $27.14 | $10.45 | 61% | $16.22 | 40% |
| May-08 | TONER,COLORSTIX 8200,5/PK | 4 | $227.00 | $199.07 | $65.83 | 67% | $89.58 | 55% |

### b) Paper Products

64.     Office Depot also overcharged Plaintiffs for paper products under the USC contract.  The USC contract priced paper at cost plus 17% GM from the manufacturer's catalog, cost plus 25% from Office Depot's wholesale catalog, or cost plus 17% GM from Office Depot's frequently-ordered products ("MFOI") catalog.  By contrast, Office Depot's contract with San Francisco priced paper products at 72% off the manufacturer's list price, while the Berkeley contract priced paper products at its 55% average blended discount.  Applying those terms to Plaintiffs' purchasing records shows the following:

**BPUSD**

| Date | Product Description | Quantity Sold | List Price | Baldwin Park USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|------|---------------------|---------------|------------|-----------------------------|-------------------------------------|-------------------------------|-------------------------------------|---------------------------|
| Jun-07 | NOTE,PST-IT(R),POP-UP,3X3 | 10 | $23.20 | $12.76 | $6.50 | 49% | $10.44 | 18% |
| Jul-08 | NOTE,PSTIT,SSTCKY,3X3,12P | 10 | $20.40 | $9.60 | $5.71 | 41% | $9.18 | 4% |
| Jan-07 | PAD,NOTE,POST-IT,5"X2",5 | 144 | $7.12 | $3.92 | $2.14 | 46% | $3.20 | 18% |
| Mar-06 | NOTE,PSTIT,SSTCKY,3X3,5PK | 4 | $9.90 | $4.66 | $2.87 | 38% | $4.46 | 4% |
| Jul-06 | NOTE,POST-IT,SUNBRITE,3X3 | 2 | $9.90 | $4.66 | $2.87 | 38% | $4.46 | 4% |

**SUSD**

| Date | Product Description | Quantity Sold | List Price | Stockton USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|------|---------------------|---------------|------------|-------------------------|-------------------------------------|-------------------------------|-------------------------------------|---------------------------|
| Aug-06 | NOTE,PST-IT(R),POP-UP,3X3 | 2 | $23.20 | $12.16 | $6.50 | 47% | $10.44 | 14% |

- 21 -

{00043590; 2}

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| May-07 | NOTE,PSTIT,SSTCKY,3X3,12P | 15 | $19.73 | $9.28 | $5.52 | 40% | $8.88 | 4% |
| Jan-07 | PAD,NOTE,POST-IT,.5"X2",5 | 30 | $7.12 | $3.92 | $2.14 | 46% | $3.20 | 18% |
| May-06 | NOTE,PSTIT,SSTCKY,3X3,5PK | 10 | $9.90 | $4.66 | $2.87 | 38% | $4.46 | 4% |
| Aug-06 | NOTE,POST-IT,SUNBRITE,3X3 | 71 | $9.90 | $4.44 | $2.87 | 35% | $4.46 | 0% |

### c) Technology

65. Technology products were non-core items under the USC, San Francisco, and Berkeley contracts. Option 1 of the USC contract priced "technology products" at Office Depot's cost plus a 13% GM from the manufacturer's list price, or alternately at cost plus a 22% GM from the wholesale catalog. For MFOI catalog (*i.e.*, frequently ordered) items, the price was Office Depot's cost plus a 13% GM. Meanwhile, Office Depot offered "technology" products to San Francisco at 71% off the manufacturer's list price, and to Berkeley at its 55% average blended discount. Those discounts, applied to Office Depot's sales records to Plaintiffs, show that Plaintiffs were overcharged:

**BPUSD**

| Date | Product Description | Quantity Sold | List Price | Baldwin Park USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| May-06 | HEADSET,WIRELESS,CS50 | 1 | $299.99 | $215.29 | $87.00 | 60% | $96.88 | 55% |
| May-06 | DRIVE,USB,1GB,BLUE | 4 | $74.99 | $67.49 | $21.75 | 68% | $33.75 | 50% |

**SUSD**

| Date | Product Description | Quantity Sold | List Price | Stockton USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| Mar-07 | HEADSET,WIRELESS,CS50 | 1 | $54.95 | $38.21 | $15.94 | 58% | $17.19 | 55% |
| Oct-06 | DRIVE,USB,1GB,BLUE | 5 | $74.99 | $41.24 | $21.75 | 47% | $33.75 | 18% |

### d) General Supplies

66. The USC, San Francisco, and Berkeley contracts each included general supplies among their non-core items. "Option 1" of the USC contract priced

"general office supplies" at 45% off the manufacturer's list price with a 15% GP floor, at 10% off Office Depot's wholesale catalog, and at 70% off the manufacturer's list price with a 15% GP floor for items ordered from the MFOI catalog.  Office Depot's contract with San Francisco lacked a separate category for "general supplies," but priced corresponding items, such as binders, calendars, labels, and pens and pencils, at either 70% or 71% off the manufacturer's list price. The Berkeley contract, meanwhile, priced such general supplies at the 55% average blended discount.  Office Depot sales records for Plaintiffs show that Plaintiffs were substantially overcharged for general supplies:

## BPUSD

| Date | Product Description | Quantity Sold | List Price | Baldwin Park USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| | **PLANNERS/CALENDARS** | | | | | | | |
| Dec-08 | PLNR,WIREBD,MTHLY,9X11,BL | 2 | $16.89 | $9.29 | $5.07 | 45% | $7.60 | 18% |
| Dec-08 | CALENDAR,OD,DSKPD,RY,22X1 | 3 | $3.59 | $2.56 | $1.08 | 58% | $1.62 | 37% |
| Sep-08 | PLNR,WIREBD,MTHLY,9X11,BL | 1 | $15.99 | $9.18 | $4.80 | 48% | $7.20 | 22% |
| Sep-06 | CALENDAR, AY 16M DSK/W,11 | 3 | $9.89 | $5.44 | $2.97 | 45% | $4.45 | 18% |
| | **BINDERS** | | | | | | | |
| Jul-07 | BINDER,RR,8-1/2X5,2"BLK | 1923 | $7.50 | $4.53 | $2.25 | 50% | $3.38 | 25% |
| | **LABELS** | | | | | | | |
| May-06 | LABEL,LSR,ADDR,WHT,3000CT | 6 | $42.00 | $18.54 | $12.60 | 32% | $7.35 | 60% |
| Jul-07 | LABEL,DOT,P S,.75IN,MUL 1 | 1 | $8.46 | $4.65 | $2.54 | 45% | $3.81 | 18% |

## SUSD

| Date | Product Description | Quantity Sold | List Price | Stockton USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|---|---|---|---|---|---|---|---|---|
| | **PLANNERS/CALENDARS** | | | | | | | |
| Dec-08 | PLNR,WIREBD,MTHLY,9X11,BL | 2 | $16.89 | $9.29 | $5.07 | 45% | $7.60 | 18% |
| Dec-08 | CALENDAR,OD,DSKPD,RY,22X1 | 6 | $3.59 | $2.56 | $1.08 | 58% | $1.62 | 37% |
| Dec-08 | CALENDAR,WALL 3MOS,151/2X | 28 | $18.19 | $10.00 | $5.46 | 45% | $8.19 | 18% |
| Nov-06 | CALENDAR,WALL 3MOS,151/2X | 12 | $17.59 | $9.67 | $5.28 | 45% | $7.92 | 18% |
| | **BINDERS** | | | | | | | |
| May-08 | BINDER,OD,VIEW,RR,2",BLAC | 100 | $9.61 | $5.29 | $2.88 | 46% | $4.32 | 18% |
| Aug-08 | BINDER,RR,8-1/2X5,2"BLK | 1 | $7.50 | $4.75 | $2.25 | 53% | $3.38 | 29% |

- 23 -

{00043590; 2}

| Feb-07 | BINDER,RR,VIEW,LCK,1.5",B | 100 | $10.69 | $5.88 | $3.21 | 45% | $2.65 | 55% |

**LABELS**

| May-08 | LABEL,LSR,ADDR,WHT,3000CT | 20 | $42.00 | $18.54 | $12.60 | 32% | $7.35 | 60% |
| May-07 | LABEL,DOT,P S,.75IN,MUL 1 | 4 | $8.46 | $4.65 | $2.54 | 45% | $3.81 | 18% |

### e)   Furniture

67.    Furniture products were non-core items under the USC, San Francisco, and Berkeley contracts.  Option 1 of the USC contract priced furniture at 45% off the manufacturer's list price with a 15% GP floor or at 10% off Office Depot's wholesale catalog.  Office Depot's contract with San Francisco priced office furniture at 50% off the manufacturer's list price.  The Berkeley contract priced office furniture at the 55% average blended discount.  Office Depot sales records for Plaintiffs show the overcharge percentages resulting from these discounts:

**BPUSD**

| Date | Product Description | Quantity Sold | List Price | Baldwin Park USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|------|---------------------|---------------|------------|------------------------------|-------------------------------------|-------------------------------|------------------------------------|---------------------------|
| Jan-06 | CHAIR,TASK,SUEDE,GREY | 1 | $129.99 | $94.49 | $65.00 | 31% | $58.50 | 38% |
| Oct-06 | CHAIRMAT,W/LIP,46X60 | 1 | $178.61 | $160.75 | $89.31 | 44% | $80.37 | 50% |
| Jun-07 | BOOKCASE,47X34.5X12-5/8,P | 2 | $207.00 | $113.85 | $103.50 | 9% | $93.15 | 18% |

**SUSD**

| Date | Product Description | Quantity Sold | List Price | Stockton USD Sell Price | San Francisco Core Item or Discount | San Francisco Price Difference | Berkeley Core Item or 55% Discount | Berkeley Price Difference |
|------|---------------------|---------------|------------|--------------------------|-------------------------------------|-------------------------------|------------------------------------|---------------------------|
| Sep-07 | CHAIR,TASK MID BCK,BK | 1 | $161.00 | $129.79 | $80.50 | 38% | $72.45 | 44% |
| Feb-08 | CHAIR,FLDG,METAL,4/PK,TAN | 112 | $62.99 | $40.80 | $31.50 | 23% | $28.35 | 31% |
| Apr-08 | CART,CHAIR,2-TIER | 6 | $465.00 | $305.99 | $232.50 | 24% | $209.25 | 32% |
| Apr-06 | BOOKCASE,3-SHELF,HARVEST | 2 | $130.95 | $72.02 | $65.48 | 9% | $32.41 | 55% |

68.    The above examples, which are drawn from Office Depot's actual claims for payment from the Plaintiffs, are representative of the overcharges paid by Plaintiffs for the duration of the USC contract.  Although the San Francisco and

- 24 -

{00043590; 2}

Berkeley contract pricing models might occasionally have resulted in higher prices for some individual items than the USC contract, the aggregate difference between the pricing models employed in the San Francisco and Berkeley contracts and the pricing model employed in the USC contract over their common time period resulted in a substantial overcharge to Plaintiffs.

69.     Office Depot knew the prices it offered to San Francisco and Berkeley were significantly lower than those it offered to Plaintiffs.  Under Office Depot's corporate structure, an account manager, district manager, and regional sales director would all have had a role in negotiating the San Francisco and Berkeley contracts.  Authorization to enter into the contracts would come from the Vice President for the Western Region, Pat Welch, who had overall authority over all government pricing within California, with additional oversight by the Western Region manager of Office Depot's public sector business and by Robert Cetina. Office Depot was organized so that the individuals in each of these positions were also responsible for marketing to and/or managing customers with USC contracts. Furthermore, because L.A. County was the lead public entity on the USC contract, the same senior Western Region managers who approved the USC contract, including Robert Cetina, were the ones to approve the San Francisco and Berkeley contracts.

70.     Under the terms of the USC contract, Office Depot was obligated to provide Plaintiffs with its best governmental pricing.  Office Depot simply ignored that obligation when it charged Plaintiffs in excess of that amount.  Even if Office Depot interpreted the USC contract to permit Office Depot to charge Plaintiffs more than it charged other governmental customers, Office Depot fraudulently misrepresented its understanding of its contractual obligations to Plaintiffs through false Supplier Commitments and other false sales and marketing tactics.

71.     Office Depot marketed the USC contract to Plaintiffs based on the terms of the USC contract, including the "Supplier Commitments" to the USC

contract, as well as Office Depot's representations about the benefits to Plaintiffs of joining the USC contract.  The Supplier Commitments represented that Office Depot's pricing under the USC contract was its best pricing to government customers.  When marketing the USC contract to Plaintiffs, Office Depot and its agents consistently represented that U.S. Communities members would receive Office Depot's best governmental pricing, without qualification.  Based on these terms and representations, Plaintiffs believed when they entered into the USC contract that they would receive Office Depot's best government pricing.  At the same time that Office Depot was making those representations, however, Office Depot negotiated and entered into contracts with San Francisco and Berkeley at prices lower than those in the USC contract.  Office Depot's representations to Plaintiffs that they would receive its best pricing to government customers were therefore false.  The false representations were an essential inducement to Plaintiffs to enter into the USC contract with Office Depot and to purchase office supplies thereunder.  Office Depot thereby fraudulently induced Plaintiffs to do business with Office Depot.

**B.    Office Depot Inflated the 15% Gross Profit Floor Charged to Plaintiffs by Misrepresenting its Costs**

72.    Under Master Agreements No. 41421 and No. 42595 (Option 1) Office Depot charged Plaintiffs for non-core items at the greater of either (a) a set discount off the manufacturer's list price, or (b) Office Depot's minimum "floor" price for the items, which was its cost for the items plus 15% GP.

73.    Office Depot's "cost" under the minimum floor price provision should have been calculated as what it actually paid to the manufacturer for the item sold (after factoring in all applicable rebates and discounts).  The additional 15% GP above that cost was to compensate Office Depot for its operational expenses (such as transportation, overhead, and labor costs), and provide a reasonable profit margin.

74.     Office Depot keeps its costs confidential and does not disclose them to customers.  As a consequence, public entities have no way to compare the cost on their invoice to the price Office Depot paid the supplier for the item, because Office Depot does not divulge the price it paid.  Thus, whenever Office Depot charges the customer at the GP floor, the customer must trust Office Depot to have reported its cost honestly.

75.     Office Depot misrepresented its costs as a matter of course so that its GP floor price consistently exceeded its discounted list price.  As a result, Office Depot converted the "minimum" GP floor into a surcharge, added whenever the discounted list price was too low for its liking.

76.     For example, if Office Depot pays a manufacturer $1.00 for a binder with a $5.00 list price in the manufacturer's catalog, the price for the binder to the customer under the USC contract is $2.75.  The price is first calculated as the manufacturer's list price minus the 45% discount: $5.00 – $2.25 = $2.75.  Office Depot then automatically calculates the GP floor.  Under this scenario, GP would be the $1.00 cost to Office Depot plus a 15% markup, or $1.15.  The $1.15 GP floor is then compared automatically to the $2.75 discounted manufacturer's list price, with the customer paying Office Depot the higher of the two prices, or $2.75.  If, however, Office Depot misrepresents that it paid the manufacturer $3.00 for the binder instead of $1.00, then its GP floor becomes $3.45 ($3.00 x 1.15).  The inflated amount becomes the price charged to the customer, because it exceeds the $2.75 discounted manufacturer's list price.  By overstating its costs, Office Depot receives an extra 70 cents for the binder.

77.     Office Depot did not always use its actual invoiced cost to compute the GP floor, instead padding the GP floor by adding in miscellaneous costs.  As set forth above, the USC contract already compensated Office Depot for its "miscellaneous costs" through the 15% margin added to its invoiced cost.  Thus, the additional costs were improper.  Office Depot added them for a simple reason: to

{00043590; 2}

1  inflate the GP floor until it exceeded the discounted manufacturer's list price,

2  thereby increasing the customer's end price.

3      78.    Such manipulations increased Plaintiffs' costs substantially.  On

4  information and belief, Office Depot charged Plaintiffs the GP floor price for far

5  more items than was actually warranted.  Plaintiffs therefore lost much of the benefit

6  of the fixed discounts L.A. County had negotiated.

7  **C.    Office Depot Did Not Apply Manufacturer Rebates to its Discounted Manufacturer's List Price or When Calculating its GP Floor Price**

8

9      79.    Office Depot receives significant manufacturer rebates that reduce the

10  net price Office Depot pays to its suppliers substantially.  The company negotiates

11  the rebates with manufacturers based on the dollar amount of Office Depot's

12  purchases of their wares.  For large suppliers, Office Depot may bargain for a refund

13  of 15% or more on its purchases.  Manufacturer rebates are negotiated at the highest

14  levels of Office Depot's management, which keeps the rebate percentages

15  confidential.

16      80.    The USC contract's discount from the manufacturer's list price

17  includes a 15% GP floor.  Calculated fairly, the GP floor represents Office Depot's

18  cost from the manufacturer plus a 15% markup that accounts for Office Depot's

19  operational expenses.  A rebate from the manufacturer affects Office Depot's cost

20  for the item from the manufacturer, and accordingly must be applied when

21  calculating the GP floor.

22      81.    Office Depot excluded manufacturer rebates from its calculation of the

23  GP floor.  It therefore charged Plaintiffs a higher "minimum" price based on costs it

24  did not fully incur.  For example, if Office Depot paid $50.00 to its supplier for an

25  item with a $100 list price, a 45% discount off list price would be $55.00, but, as a

26  result of the GP floor, the actual sale price would be $57.50 ($50.00 cost + 15% GP,

27  or $7.50, = $57.50).  If the manufacturer gives Office Depot a 20% rebate on the

28  item as a result of volume purchasing, however, Office Depot's cost for the item is

- 28 -

{00043590; 2}

only $40 ($50 initial cost minus $10 rebate).  In that case, the price to the customer should be the discounted list price, $55.00 (45% discount off of a $100 list price), because that price is greater than the GP floor ($40.00 cost + 15% GP, or $6.00, equals $46.00 price floor).  Office Depot's failure to factor the rebate into its cost calculation would result, in this example, in an overcharge of $2.50.

82.     On information and belief, Office Depot's failure to apply manufacturer rebates when calculating the GP floor was a conscious decision made on a national basis by senior executives in the company's government and education business.

83.     Moreover, Office Depot similarly excluded manufacturer rebates from the discounted manufacturer's list price.  Thus, regardless of whether the company charged the customer under the discounted manufacturer's list price or the GP floor, it excluded its rebates from its pricing calculations.

**D.     Office Depot Increased Its Prices Regularly, In Knowing Violation of the Contract**

84.     The USC contract allowed Office Depot to increase its prices on only two dates each year: January 1 and July 1.  *See ¶¶* 29, 43.  If Office Depot in fact increased prices on those dates, it was required to inform L.A. County of the increases.  *Id.*

85.     With complete disregard for these contract terms, Office Depot increased the prices it charged to USC contract customers more than twice a year and without disclosure.

86.     First, Office Depot from the beginning lacked a system for keeping the list prices in its catalogs firm for six-month increments.  On information and belief, the company used its global pricing system for the USC contract, the same as for its other contracts.  List prices changed regularly in the global system, as hundreds of suppliers intermittently changed their prices.  The system did not allow Office Depot to change the price of an item in the global system while keeping the original

{00043590; 2}

1  price firm for U.S. Communities members.  Thus, Office Depot contracted to hold

2  its USC contract prices firm but used a system that could not do so.  Office Depot

3  knew its price changes were not in compliance with its contract, but viewed the

4  contract term as burdensome and made no effort to honor it.

5       87.    Second, Office Depot churned the pricing of its private-label products.

6  Unlike products from other suppliers, Office Depot sets the list price of its private-

7  label products, including the Office Depot, Foray, and Ativa brands.  Office Depot

8  exploited that freedom by increasing the list price of those products in modest

9  increments repeatedly, sometimes multiple times in a week.  These list price

10  increases were unannounced and intentionally hard for customers to spot.  Though

11  they appeared on Office Depot's website, customers could not uncover the

12  overcharges without comparing new and old invoices, which Office Depot knew its

13  customers rarely did.

14       88.    Office Depot understood the opportunity its private-label products

15  represented.  By the end of 2007, increasing the sales percentage of private-label

16  products had become a major initiative of the company.  Private-label products often

17  replaced products from other suppliers on the USC contract core item list.  Office

18  Depot benefited from the increased sales of its private-label products through the

19  USC contract because it was steadily increasing the list price of those products.

20       **E.    Office Depot Overcharged Plaintiffs For Core List Items**

21       89.    On information and belief, Office Depot charged Plaintiffs 10% off the

22  wholesale catalog price for core list products that for core list products that should

23  have received core list pricing, which was significantly lower than 10% off the

24  wholesale catalog price for those products.  The company accomplished this fraud

25  by choosing not to keep the items in stock, thereby giving it a pretense for calling

26  the items "discontinued," and removing them from the core list.  Once the items

27  were removed from the core list, Office Depot applied the wholesale price, and not

28  the agreed-upon core item price, to the discontinued items.  As a result, Office

Depot reduced the customer's discount significantly (while at the same time reducing Office Depot's own operational expenses, because it could have the items shipped directly from the wholesaler to the end customer). Office Depot discontinued the core list items solely to change the items' pricing, not because the items were discontinued by the manufacturer or otherwise no longer available.

90. Moreover, Office Depot replaced many of the discontinued items on the core list with equivalent products from its private labels, thereby enabling it to control those items' list price. *See supra*, at ¶87. Thus, the customer overpaid whether it chose to order the discontinued item no longer on the core list, or the substituted private-label item on the core list.

## COUNT I
### Violations of the California False Claims Act
### Cal. Gov't Code §§ 12651(a)(1) and (a)(2)

91. Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 90 of this Complaint.

92. This is a claim for treble damages and forfeitures under the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*

93. Pursuant to Cal. Gov't Code § 12651(a)(1), through the acts described above, Defendant, its agents, employees and co-conspirators, knowingly presented and caused to be presented to officers and/or employees of Plaintiffs false and fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment and approval from Plaintiffs.

94. Pursuant to Cal. Gov't Code § 12651(a)(2), through the acts described above, Defendant, its agents, employees and co-conspirators, knowingly made, used, and caused to be made and used false records and statements, which also omitted material facts, in order to induce Plaintiffs to approve and pay false and fraudulent claims.

95. Pursuant to Cal. Gov't Code § 12651(a)(1), through the acts described above, Defendant, its agents, employees and co-conspirators, fraudulently induced

{00043590; 2}

Plaintiffs to enter into the USC contract by representing falsely that the pricing in the USC contract was Defendant's best pricing for governmental customers, including without limitation by representing falsely in the Supplier Commitments that Defendant's pricing "is the lowest available pricing (net to buyer) to state and local agencies nationwide."

96.     Plaintiffs were unaware of the falsity of the records, statements, and claims made and submitted by Defendant, its agents, employees, and co-conspirators, and as a result thereof, paid money that they otherwise would not have paid, and were deprived of money, property or services, as a result of Defendant's actions.

97.     By reason of the payment made by Plaintiffs as a result of Defendant's fraud, Plaintiffs have suffered damages in an amount to be determined at trial.

98.     Plaintiffs are entitled to the maximum penalty of $10,000 for each and every false or fraudulent claim made, used, presented or caused to be made used or presented by Defendant.

## COUNT II
### Breach of Contract

99.     Plaintiffs reallege and incorporate by reference the allegations made in Paragraphs 1 through 90 of this Complaint.

100.   Plaintiffs entered into agreements with Defendant ("the Agreements") whereby Defendant sold, and Plaintiffs purchased, office supplies pursuant to the terms of the USC contract.

101.   Defendant entered into agreements with U.S. Communities whereby Defendant agreed to abide by certain commitments in exchange for the right to sell office supplies to governmental entities under the USC contract (the "Administrative Agreements").

{00043590; 2}

1    102.   When it entered into the Administrative Agreements, Defendant and
2    U.S. Communities intended the terms of the Administrative Agreements to
3    ultimately benefit Plaintiffs.

4    103.   Accordingly, Plaintiffs were an intended third-party beneficiary of the
5    Administrative Agreements.

6    104.   Under the terms of the Agreements and the Administrative
7    Agreements, Defendant was obligated to provide Plaintiffs with its most favored
8    public entity prices.

9    105.   Under the terms of the Agreements, Defendant was obligated to
10   calculate its minimum floor price as its actual invoiced cost plus 15% GP and to
11   factor manufacturer rebates into the actual invoiced cost.

12   106.   As set forth above, Defendant did not provide Plaintiffs with its most
13   favored public entity pricing.

14   107.   As set forth above, Defendant added costs to its actual invoiced cost
15   before calculating its 15% GP and did not factor manufacturer rebates into its actual
16   invoiced cost.

17   108.   Accordingly, Defendant breached its obligations under the Agreements.

18   109.   Defendant's breach of its obligations under the Agreements has
19   proximately caused reasonably foreseeable damages to Plaintiffs.

20   110.   As a result of Defendant's wrongful conduct, Plaintiffs have suffered
21   damages in an amount to be determined at trial.

## COUNT III
### Fraud

24   111.   Plaintiffs reallege and incorporate by reference the allegations made in
25   Paragraphs 1 through 90 of this Complaint.

26   112.   Through the acts described above, Defendant made misrepresentations
27   and omissions of material fact concerning the cost and price of products sold to
28   Plaintiffs under the USC contract.

113.   Defendant made these misrepresentations and omissions of material fact with knowledge of their falsity and/or with reckless disregard for their truth.

114.   Defendant made these misrepresentations and omissions of material fact intending that Plaintiffs, directly or indirectly, would rely on their accuracy in beginning or continuing to do business with Defendant and in purchasing goods from Defendant under the USC contract.

115.   Plaintiffs justifiably relied on these misrepresentations and omissions of material fact concerning the cost and price of products sold to them under the USC contract when they purchased products from Defendant under the USC contract.

116.   As a result of Defendant's wrongful conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

117.   In addition to compensatory damages, given Defendant's bad faith and/or malicious, willful, reckless, wanton, or fraudulent conduct, Plaintiffs are entitled to recover punitive damages.

## PRAYER

Wherefore, Plaintiffs BPUSD, MUSD, RUSD, and SUSD pray for judgment against Defendant Office Depot as follows:

1.   As to Count I, that the Court enter judgment against Defendant in an amount equal to three times the amount of damages sustained by BPUSD, MUSD, RUSD, and SUSD as a result of Defendant's actions in violation of the California False Claims Act, as well as a civil penalty of $10,000 for each violation of Cal. Gov't Code § 12651;

2.   As to Count II, that the Court enter judgment against Defendant in an amount equal to all damages proximately caused by Defendant's conduct in an amount to be proven at trial;

{00043590; 2}

3.    As to Count III, that the Court enter judgment against Defendant in an amount equal to all damages proximately caused by Defendant's conduct in an amount to be proven at trial; and

4.    Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.

Dated:  December 13, 2012

By: _____

ERIC R. HAVIAN (SBN 102295)
STEPHEN HASEGAWA (SBN 198472)
EDWARD H. ARENS (SBN 259155)
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, California  94105
Tel: (415) 836-9000
Fax: (415) 836-9001

MARK ALLEN KLEIMAN (SBN 115919)
2907 Stanford Avenue
Venice, California 90292
Tel: (310) 306-8094
Fax: (310) 306-8491

ALTOMEASE R. KENNEDY (*Pro Hac Vice*)
8601 Georgia Avenue, Suite 1010
Silver Spring, Maryland 20901
Tel: (301) 565-5281
Fax: (301) 565-5285

Attorneys for Intervenors, BALDWIN PARK UNIFIED SCHOOL DISTRICT, MONROVIA UNIFIED SCHOOL DISTRICT, ROWLAND UNIFIED SCHOOL DISTRICT and STOCKTON UNIFIED SCHOOL DISTRICT

- 35 -

{00043890; 2}

1

2     DANA J. MCCUNE (SBN 82525)
      MCCUNE & HARBER LLP
3     515 South Figueroa Street, Suite 1150
      Los Angeles, CA 90071
4     Tel: (213) 689-2500
      Fax: (213) 689-2501
5

6

7     Attorneys for Intervenors, BALDWIN PARK
      UNIFIED SCHOOL DISTRICT,
8     MONROVIA UNIFIED SCHOOL
      DISTRICT, and ROWLAND UNIFIED
9     SCHOOL DISTRICT

10

11    CHESLEY D. QUAIDE (SBN 136238)
      ATKINSON, ANDELSON, LOYA, RUUD
12    & ROMO, P.C.
      5075 Hopyard Road, Suite 210
13    Pleasanton, California 94588
      Tel: (925) 227-9200
14    Fax: (925) 227-9202

15

16    Attorneys for Intervenor STOCKTON
      UNIFIED SCHOOL DISTRICT
17

18

19

20

21

22

23

24

25

26

27

28

- 36 -

{00043590; 2}

PROOF OF SERVICE

I am employed in the County of San Francisco, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 100 The Embarcadero, Suite 300, San Francisco, CA 94105.

On December 13, 2012, I served the foregoing document described as: COMPLAINT-IN-INTERVENTION OF BPUSD, MUSD, RUSD, AND SUSD in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

| | |
|---|---|
| Mark Allen Kleiman<br>Law Offices of Mark Allen Kleiman<br>2907 Stanford Avenue<br>Venice, CA 90292<br>Telephone No.: (310) 306-8094<br>Facsimile No.: (310) 406-8491<br>Email: mkleiman@quitam.org<br><br>Altomease R. Kennedy<br>McKnight & Kennedy LLC<br>Lee Plaza, Suite 1010<br>8601 Georgia Avenue<br>Silver Spring, MD 20910<br>Telephone:  301-565-5281<br>Facsimile:   301-565-5285<br>Email: akennedy@mcknightandkennedy.com | Attorneys for Cities of Lakewood, Livermore, Los Angeles, Pico Rivera, Pomona, Porterville, San Bernardino, Santa Fe Springs, Santa Maria, and West Covina; San Joaquin County Office of Education, Stanislaus County Office of Education, Merced Union High School District; the School Districts of Azusa, Baldwin Park, Monrovia, and Rowland; and for *Qui Tam* Plaintiff David Sherwin. |
| Arnold M. Alvarez-Glasman, Esq.<br>Teresa Chen, Esq.<br>Alvarez-Glasman & Colvin<br>13181 Crossroads Parkway North<br>Suite 400, West Tower<br>City of Industry, CA 91746 | Attorneys for City of West Covina, City of Pico Rivera, City of Pomona<br><br>Telephone No.: (562) 699-5500<br>Facsimile No.: (562) 692-2244 |
| D. Stephen Schwabauer, City Attorney<br>Janice D. Magdich, Deputy City Attorney<br>City of Lodi<br>221 West Pine Street<br>Lodi, CA 95240 | Attorneys for City of Lodi<br><br>Telephone No.: (209) 333-6701<br>Facsimile No.: (209) 333-6807 |
| Lori E. Pegg, Acting County Counsel<br>Winifred Botha, Assistant County Counsel<br>Greta S. Hansen, Lead Deputy County Counsel<br>Office of the County Counsel<br>70 West Hedding Street, East Wing, 9th Floor<br>San Jose, CA 95110-1770 | Attorneys for County of Santa Clara<br><br>Telephone No.: (408) 299-5930<br>Facsimile No.: (408) 292-7240<br>Email: greta.hansen@cco.sccgov.org |

1

{00040486; 1}

PROOF OF SERVICE

| | |
|---|---|
| Laurie Rittenberg<br>Managing Assistant City Attorney<br>Los Angeles City Attorney's Office<br>800 City Hall East<br>200 N. Main Street<br>Los Angeles, California 90012 | Attorneys for City of Los Angeles<br><br>Telephone No.: (213) 473-6848<br>Facsimile No.: (213) 473-6818<br>Email: Laurie.Rittenberg@lacity.org |
| Arthur G. Wille<br>Deputy County Counsel<br>*[service via email]*<br>Email: awille@co.fresno.ca.us | Attorneys for County of Fresno<br><br>Telephone No.: (559) 600-3479<br>Facsimile No.: (559) 600-3480 |
| Heather C. McLaughlin<br>Office of City Attorney<br>*[service via email]*<br>Email: Heather.McLaughlin@ci.benicia.ca.us | Attorneys for City of Benicia<br><br>Telephone No.: (707) 746-4216<br>Facsimile No.: (707) 745-1196 |
| Dean R. Derleth<br>G. Ross Tinrdle, III<br>Melanie N. Donnelly<br>Best Best & Krieger, LLP<br>300 South Grand Ave., 25th Floor<br>Los Angeles, CA 90071 | Attorneys for Cities of: Downey, Corona, Ontario, Maywood, Indian Wells, Clearlake, Santee, Covina, Shafter, Fontana, Palm Desert, Arcadia, Claremont, Woodland; and Attorneys for El Centro Elementary School District and San Diego County Superintendent of Schools<br><br>Telephone No.: (213) 617-8100<br>Facsimile No.: (213) 617-7480<br>Email: Dean.Derleth@bbklaw.com<br>      Ross.Trindle@bbklaw.com<br>      Melanie.Donnelly@bbklaw.com |
| James F. Penman, City Attorney<br>Diane C. Roth, Sr. Assistant City Attorney<br>300 North "D" Street<br>San Bernardino, CA 92418 | Attorneys for City of San Bernardino<br><br>Telephone No.: (909) 384-5355<br>Facsimile No.: (909) 384-5238 |
| Brita J. Bayless, City Attorney<br>Michelle Sheidenberger, Deputy City Attorney<br>311 Vernson Street<br>Roseville, CA 95678 | Attorneys for City of Roseville<br><br>Telephone No.: (916) 774-5325<br>Facsimile No.: (916) 773-7348 |
| Lisa A. Goldfien<br>Deputy City Attorney II<br>City of San Rafael<br>1400 Fifth Avenue<br>San Rafael, CA 94901 | Attorneys for City of San Rafael<br><br>Telephone No.: (415) 485-3080<br>Facsimile No.: (415) 485-3109<br>Email: lisa.goldfien@cityofsanrafael.org |

2

PROOF OF SERVICE

| | |
|---|---|
| City of Santa Maria<br>*[service via email]*<br>Wendy Stockton, wstockton@ci.santa-maria.ca.us; Julie Orozco, jorozco@ci.santa-maria.ca.us; Anna Padilla, apadilla@ci.santa-maria.ca.us | Attorneys for City of Santa Maria<br><br>Telephone No.: (805) 925-0951<br>Facsimile No.: (805) 928-1275 |
| Linda Trang<br>Office of Long Beach City Attorney<br>333 W. Ocean Blvd., 11th Floor<br>Long Beach, CA 90802 | Attorneys for City of Long Beach<br><br>Telephone No.: (562) 570-2294<br>Facsimile No.: (562) 436-1579<br>Email: linda.trang@longbeach.gov |
| Kathleen Bales-Lange<br>County Counsel for County of Tulare<br>Harold W. Wood, Jr., Chief Deputy<br>Desire Y. Serrano, Deputy<br>2900 West Burrell, County Civic Center<br>Visalia, CA 93291 | Attorneys for Plaintiff School Districts – Allensworth Elementary School, Alpaugh Unified, Cutler-Orosi Joint Unified School District, Exeter Union High School District, Exeter Union School District, Farmersville Unified School District, Kings River Union Esd, Oak Valley Union Elementary, Pleasant View Elementary School District, Strathmore Union Elementary, Sundale Elementary School District, Terra Bella Union Elementary School District, Tulare City Elementary, Tulare Joint Union High, Visalia Unified School District, Superintendent, Tulare County Office of Education, Sunnyside Union Elementary School District<br><br>Telephone No.: (559) 636-4961<br>Facsimile No.: (559) 737-4319 |
| Chesley D. Quaide<br>Atkinson, Andelson, Loya, Ruud & Romo<br>5075 Hopyard Road, Suite 210<br>Pleasanton, CA 94588 | Attorneys for Hilmar Unified School District, Jefferson School District, Lakeport Unified School District, LeGrand Union Elementary School District, Lincoln Unified School District, Los Banos Unified School District, Merced Union High School District, Merced County Office of Education, New Hope Elementary School District, San Carlos School District, San Joaquin County Office of Education, Stanislaus County Office of Education, Weaver Union School District<br><br>Telephone No.: (925) 227-9200<br>Facsimile No.: (925) 227-9202<br>Email: cquaide@aalrr.com |

{00040486; 1}                                        PROOF OF SERVICE

| Francis J. Burke, Jr.<br>Aaron Belzer<br>Seyfarth Shaw LLP<br>2029 Century Park East, Suite 3500<br>Los Angeles, CA 90067 | Attorneys for Defendant Office Depot<br><br>Telephone No.: (310) 277-7200<br>Facsimile No.: (310) 201-5219 |
|---|---|
| Daniel Franklin Katz<br>Juli Ann Lund<br>Paul T. Hourihan<br>William P. Ashworth<br>Williams and Connolly LLP<br>725 Twelfth Street NW<br>Washington, DC 20005-5901 | Attorneys for Defendant Office Depot<br><br>Telephone No.: (202) 434-5143<br>Facsimile No.: (202) 434-5029 |

**[X]  (By United States Mail)** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses above and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the business's practice for collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

**[X]  (By Electronic Service)** Based on an agreement of the parties to accept electronic service, I caused the documents to be sent to the person at the electronic service addresses above.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on December 13, 2012.

Zengel

CHRISTINE ZENGEL

{00040486; 1}                    PROOF OF SERVICE